# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2887

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

v.

CITY WIDE INSULATION OF MADISON, INC.,
d/b/a BUILDERS' INSULATION, INC.,

*Respondent.*

———————

Application for Enforcement of a Final Order
of the National Labor Relations Board
No. 30-CA-16393

———————

ARGUED FEBRUARY 13, 2004—DECIDED MAY 27, 2004

———————

Before FLAUM, *Chief Judge*, and MANION and DIANE P. WOOD, *Circuit Judges.*

MANION, *Circuit Judge.* The National Labor Relations Board ("NLRB" or "Board") petitions for enforcement of its order that City Wide Insulation of Madison, Incorporated, bargain with the Milwaukee and Southern Wisconsin Regional Council of Carpenters ("the Union"). Because the Board's decision has a reasonable basis in law, and be-

cause substantial evidence supports both the Board's substantive conclusion and decision not to hold an evidentiary hearing, we enforce the Board's order.

## I.

City Wide buys and sells insulation from its facility in Germantown, Wisconsin. On October 18, 2002, the Union petitioned to represent the insulation workers at that location, and the Union and City Wide then agreed to hold a representation election on November 20, 2002, from 7:00 a.m. to 7:30 a.m at City Wide's Germantown location. Unfortunately, because of the Board's negligence, the Board agent responsible for conducting the election failed to appear on the morning of November 20. Although the Board offered to send an agent later that day or on November 21, City Wide rejected those proposals. The parties and the Board eventually agreed to hold the election on November 26. There were 21 eligible voters, and the Union prevailed by a vote of 15 to 5. City Wide challenged the election procedures administratively on the grounds that its employees inferred from the delay that City Wide had tampered with the election process, and neither the Union nor the Board did anything to dispel that notion. The Board rejected this argument and certified the Union as the unit employees' exclusive representative.[1]

The Union then asked City Wide to bargain. After City Wide refused, the Union filed a charge of unfair labor practices with the Board, contending that City Wide violated 29

---

[1]  A certification order is not appealable, but City Wide properly obtained judicial review by refusing to bargain and then asserting its objections to the election as a defense to the ensuing charge of an unfair labor practice. *See, e.g., Vitek Elecs., Inc. v. NLRB*, 763 F.2d 561, 567 n.10 (3d Cir. 1985); *General Fin. Corp. v. FTC*, 700 F.2d 366, 370 (7th Cir. 1983).

U.S.C. §§ 158(a)(1) and (a)(5). City Wide's only defense was that it was under no obligation to bargain because the Union had not been properly certified. Without holding an evidentiary hearing, the Board once again concluded that the certification election was proper and ordered City Wide to bargain with the Union. The Board also opined that, "[i]n order to avoid objections similar to the one the employer has raised here, we find that it would be preferable for Regional Offices to include in any notice of rescheduled election a statement that the election has been rescheduled for administrative reasons beyond the control of the employer or the union."[2]

City Wide appeals, maintaining that the Board's decision lacks a reasonable basis in law, that substantial evidence did not support the Board's decision, and that the Board erred by refusing to conduct an evidentiary hearing.

## II.

Under 29 U.S.C. §§ 160(e) and (f), we have jurisdiction over petitions for review of the Board's decisions. *Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 502 (7th Cir. 2003). Our function is to decide whether the Board's factual decisions are supported by substantial evidence and whether its legal conclusions have a reasonable basis in law. *Id.* The Board's factual decisions satisfy the substantial evidence standard where the Board relies upon "such relevant

---

[2] This is a recommendation with which we heartily agree. Where, as here, the Board's negligence causes a certification election to be delayed, the best course would be for the Board to issue a strong disclaimer to the effect that it, and not the employer or union, is responsible for the mishap. Such a statement would avoid confusion, and a possible negative reaction, among employees in the bargaining unit. It would also go a long way toward nipping controversies like this one in the bud.

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* We apply a similarly deferential standard to whether the Board's legal conclusions have a reasonable basis in law. *Id.* Bearing those standards in mind, we turn to the relevant statutory provisions.

Under 29 U.S.C. § 158, an employer may not "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title," 29 U.S.C. § 158(a)(1), nor may an employer "refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title," 29 U.S.C. § 158(a)(5). Framed as an affirmative requirement, these two provisions require an employer to bargain in good faith with a properly certified union. *NLRB v. Horizon Hotel Corp.*, 49 F.3d 795, 805-06 (1st Cir. 1995); *NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 821 (7th Cir. 1991).

City Wide argues that the Union was never properly certified and that it was thus under no obligation to bargain. A union may obtain certification in one of two ways: through an election or the employer's voluntary recognition. *Lincoln Park Zoological Soc. v. NLRB,* 116 F.3d 216, 219 (7th Cir. 1997). Here, of course, there was no voluntary recognition and the only question is whether the Union obtained recognition through a valid election.

### A. Whether the Board's decision has a reasonable basis in law.

The Board[3] stated that the election procedures were valid because they met the standard set forth by the laboratory

---

[3] The Board adopted the Regional Director's findings and recommendations holding that the election was proper, and so it is those findings and recommendations, incorporated in the Board's order, that we review. *See Kendall College v. NLRB*, 570 F.2d 216, 218 n.1 (7th Cir. 1978).

conditions doctrine enunciated in *General Shoe Corp.*, 77 NLRB 124 (1948).[4] City Wide nonetheless maintains that the Board, despite the pretense of applying the laboratory conditions doctrine, actually failed to use that standard, thus leaving the Board's decision without a reasonable basis in law. In general, the laboratory conditions doctrine is satisfied where the employees exercised a "free choice." *Overnite Transp. Co. v. NLRB*, 104 F.3d 109, 113 (7th Cir. 1997) (reviewing the Board's application of the laboratory conditions doctrine). Because the alleged misconduct in this case, the delay, emanates from a third party, the Board, the more specific question is whether "the rational, uncoerced selection of a bargaining representative" was possible despite the Board's negligence. *Id.*; *see also NLRB v. Chicago Tribune Co.*, 943 F.2d 791, 794 (7th Cir. 1991) (stating that the party seeking to set aside a Board-certified election must show not only that improprieties occurred, but that they interfered with employees' free choice to such an extent that they "materially affected the results of the election").

At the beginning of the Regional Director's analysis, which was adopted in full by the Board, the Regional Director thoroughly delineated City Wide's evidence, cited *General Shoe Corp.*, and then stated that he was applying the laboratory conditions test to that evidence. He then

---

[4] The laboratory conditions doctrine has elicited criticism, some of it from this court. *See*, *e.g.*, *NLRB v. Lovejoy Indus., Inc.*, 904 F.2d 397, 402 (7th Cir. 1990) (reasoning that, for a representation election to be adequate, it is not necessary that employees be treated "as if they were bacteria on a petri dish that must be kept free of contamination"). Historically, moreover, the Board itself has flip-flopped on whether the laboratory conditions doctrine is correct. 1 *The Developing Labor Law* 446-47 (Hardin et al. eds., 4th ed. 2001). Nonetheless, the doctrine has a reasonable basis in law. *See id.*

discussed why, in his view, neither the NLRB's "failure to provide a more complete explanation" for why the election was delayed, nor the speculation of some employees as to why the election was postponed, disrupted the "laboratory conditions" in which the election had to be held.

Despite the Regional Director's invocation of the laboratory conditions test, City Wide, as noted above, argues that the Regional Director did not really apply that doctrine. It bases this contention primarily on the Regional Director's reliance on a few cases, *e.g.*, *Malta Constr. Co.*, 276 NLRB 1494 (1985), that did not directly concern the laboratory conditions doctrine, but instead related to the disenfranchisement test. The disenfranchisement test is different from the laboratory conditions doctrine in that it typically applies to situations in which some, but not all, employees were alleged to have been denied the chance to vote. *See*, *e.g.*, *Wolverine Dispatch, Inc.*, 321 NLRB 796, 796-98 (1996) (applying the disenfranchisement test where polls closed early, preventing a minority of employees from voting). Under the disenfranchisement test, an election will be set aside if the number of employees possibly disenfranchised is sufficient to affect the election's outcome. *Id.* at 797.

The two standards are analogous, so much so that it is not always clear where to draw the line between them. For example, if inclement weather prevents one employee from voting, depending on the circumstances, the disenfranchisement test may apply. *See V.I.P. Limousine, Inc.*, 274 NLRB 641 (1985) *(citing Wanzer Dairy*, 232 NLRB 631 (1977)). A storm that prevents one-quarter of eligible employees from voting, however, calls for the laboratory conditions doctrine. *See id.* It is unclear which test would apply to weather conditions that prevented, say, one-eighth of the employees from voting. The distinction may well be academic, because both tests have the same ultimate focus. As noted above, under either standard, the results of an election will be disturbed only where an irregularity affected the election's outcome.

Here, as City Wide correctly points out, the Regional Director cites cases applying each test. When he did so, however, the Regional Director was merely relying on analogous authority. Disenfranchisement cases, in which *some* employees were alleged to have been deprived of a meaningful choice in a representation election, are analogous to laboratory conditions cases, like this one, in which *all* employees are alleged to have been deprived of that meaningful choice. *Cf. Superior of Mo., Inc.*, 2002 WL 31717852, at **4-8 (NLRB 2002) (applying both the laboratory conditions doctrine and the disenfranchisement test where the election was delayed seven days because of the Board agent's failure to open the polls). Courts, of course, routinely invoke analogous authority, and we do not infer from the Regional Director's decision to do the same thing in this case that he somehow failed to apply the laboratory conditions test.

City Wide also notes that the Regional Director observed that 20 out of 21 employees voted, and that the missing employee's vote thus did not affect the election's outcome. In City Wide's view, this observation of a fact irrelevant to the laboratory conditions doctrine implies that the Regional Director did not actually apply the doctrine. The Regional Director's recitation of one fact superfluous to the laboratory conditions test, however, does not lead to the inference that he did not apply that test. We conclude that the Regional Director, and thus the Board, applied the laboratory conditions test and that the Board's decision therefore has a reasonable basis in law.

B.  *Whether substantial evidence supported the Board's decision.*

We turn next to City Wide's argument that substantial evidence does not support the Board's conclusion that the

election was proper. City Wide argues that the only reasonable conclusion is that the employees could not make a rational, uncoerced decision regarding whether to certify the Union, basing this assessment on several affidavits that are a part of the record. We address the substance of each of these affidavits, one of which is from branch manager Troy Wetzel, and the rest of which are from City Wide employees Alfonso Casillas, Ramon Martin, Jose Rodriguez, Jose Duenas, and Scott Helm.

In his affidavit, branch manager Wetzel states that employees were shocked and confused when the election was postponed. Wetzel further states that Casillas told him that employees were "pissed off" about the postponement, and that he told Casillas on November 21 that the postponement was not his fault. Although Wetzel twice states that he thought employees held him (and, by derivation, City Wide) responsible for the postponed election, he provides no basis for that conclusory assertion. Nothing in Wetzel's affidavit, therefore, would lead to the conclusion that employees were so affected by their misdirected anger toward City Wide that they could not make a rational, uncoerced decision about whether to vote for the Union.

In Casillas's affidavit, he states that employees were angry about the delay. Casillas, however, only mentions one employee, Martin, who indicated that he blamed City Wide. Casillas offers his opinion that "at least four" employees changed their votes because of the delay, but, except for his statement about Martin, offers no support for that assertion.

In his affidavit, Martin does not state that he blamed City Wide for the delay. In fact, Martin avers that "[o]n approximately November 24, 2002, the union told me that the election did not happen because the government had written down the wrong date," and that Martin himself did not know whether the NLRB was to blame.

In Rodriguez's affidavit, he states that he thought some employees changed their votes because of the delay. Rodriguez, however, does not provide a foundation for that belief.

In Duenas's affidavit, he states that he and 13 other employees were confused and surprised by the delay. He does not say, however, that he blames City Wide. On the contrary, Duenas avers that he thought that the election was cancelled because "the union and company many have reached some kind of agreement and the election was no longer necessary."

In Helm's affidavit, he begins by asserting that "[i]t is human nature to think that the company somehow fixed the election process." He then goes on to make the seemingly incompatible statement that he "was worried that *the Board* pushed us aside because we are a small company." (Emphasis added.) He acknowledges still later that he "learned that the Board Agent failed to appear for the scheduled election on November 20, 2002," and ends by saying that he does "not know why the Board Agent did not appear on November 20, 2002."

On this evidence, the Board faced a difficult decision. It may be, as City Wide intimates, that the whole of these affidavits are greater than the sum of their parts. Even though none of City Wide's employees, in his own affidavit, states that *he* thought City Wide was responsible for the delay, a reasonable factfinder might have concluded that employees' dissatisfaction with the unnecessary confusion created by the Board was great enough to disrupt laboratory conditions.

We conclude, however, that a rational factfinder could also have found, as did the Board, that the NLRB's careless error was not so severe as to deny employees a rational, uncoerced choice. It is particularly significant that, as Martin states in his affidavit, before the election took place,

the Union placed blame for the delay on the NLRB, not City Wide. We also note that Helm similarly indicates that, before the election, he "learned that the Board Agent failed to appear. . . ." We conclude that, on the basis of this evidence, a rational factfinder could have found, as did the Regional Director, that the six-day delay of the election did not bias the employees against City Wide so as to render impossible the rational, uncoerced selection of a bargaining representative. This was a close case, which means, given our deferential standard of review, that we may not disturb the Board's factual conclusion. *See Sears*, 349 F.3d at 503.

We next consider City Wide's contention that the Board's failure to set aside the election is "irreconcilable with its own precedent" and thus arbitrary. All of the cases upon which City Wide relies for that proposition concern either (1) irregularities in the conduct of elections that actually took place where the voting period was cut short, thus creating the potential for employee disenfranchisement and a different outcome to the election;[5] or (2) those cases involving a member of the Board who engaged in conduct that cast doubt on the Board's impartiality.[6] None re

---

[5] *See Gory Assoc. Indus., Inc.*, 275 NLRB 1303, 1303 (1985) (Board interpreter arrived late to ongoing election); *Nyack Hosp.*, 238 NLRB 257, 258-59 (1978) (Board agent opened polls over 1 hour late); *B&B Better Baked Foods, Inc.*, 208 NLRB 493, 493 (1974) (Board agent opened polls late, possibly disenfranchising employees); *Kerona Plastics Extrusion Co.*, 196 NLRB 1120, 1120 (1972) (Board agent closed polls early in presence of employees waiting to vote).

[6] *See NLRB v. Fresh'nd-Aire Co.*, 226 F.2d 737, 739 (7th Cir. 1955) (Board employee attended pre-election union meetings); *Renco Electronics, Inc.*, 330 NLRB 368, 368 (1999) (Board interpreter asked an employee waiting to cast a ballot, "Do you know where to put your yes vote?"); *Hudson Aviation Services, Inc.* 288

(continued...)

motely concerned a case resembling this one, in which the Board merely postponed an election for six days and did nothing that arguably made it appear to favor or oppose the Union.

However, *Superior of Mo.*, in which the election was de-layed for seven days because the Board agent overslept, is similar to this case. There, after an evidentiary hearing, the Board held that the laboratory conditions doctrine was satisfied. 2002 WL 31717852, at ** 1-3. We therefore dis-agree with City Wide's assertion that the Board's decision in this case is irreconcilable with its own precedent.

## C.   Whether an evidentiary hearing was necessary.

The final issue on appeal is whether the Board denied City Wide a hearing in violation of 29 C.F.R. § 102.69(d), which states that a hearing "shall be conducted with respect to those objections or challenges which the regional director concludes raise substantial and material factual issues." The Regional Director, in other words, must conduct a hearing when the employer puts forth facts "sufficient to support a prima facie showing of" misconduct sufficient to set aside the election. *Lovejoy Indus., Inc.*, 904 F.2d at 400 (quotation omitted). We review for substantial evidence the Board's decision regarding whether to grant a hearing pursuant to § 102.69(d). *Id.*

---

(...continued)
NLRB 870, 870 (1988) (Board agent conducting the election engaged in a loud argument with an employer representative and threatened to stop the vote); *Alco Iron & Metal Co.*, 269 NLRB 590, 590-92 (1984) (union election observer, at the request of a Board agent, translated polling procedures into Spanish to em-ployees waiting to vote); *Athbro Precision Eng'g Corp.*, 166 NLRB 966, 966 (1967) (Board agent drank beer in a café with a union representative between polling periods of a representation election).

*Lovejoy* is instructive. There, the union won the certification election by a vote of 69-39 but, according to the employer's assertions, shortly before the certification election there occurred several events that established a prima facie showing of voter intimidation sufficient to require an evidentiary hearing. Employee Alfred McCann averred that, shortly after he told a union supporter, Sacramento Olivaros, that he opposed the union, Olivaros told him that he should "watch out" and "look out." *Id.* at 399. A few days later, someone scratched McCann's car while it was parked in the company lot. *Id.* Before the election, McCann told other employees what had happened to him. Another employee also had his car vandalized before the election. *Id.* The employer pointed out that, before the organizing campaign, no car had ever been damaged in the employer's lot.

Also before the election, another anti-union employee was called a "chicken" by an unidentified union supporter, and employee Francesco Mombela signed a union authorization card because, as one of the the employer's supervisors quoted him, he "fear[ed] damage to his property and injury to his family." *Id.* The employer, as noted above, argued that these asserted facts showed a prima facie case of intimidation sufficient to require a hearing under § 102.69(d).

We disagreed, holding that substantial evidence supported the Board's decision not to hold an evidentiary hearing. This court reasoned that, although the employer's professed facts showed that employees feared union coercion, "[p]rofessions of fear from employees who do not or cannot explain its basis do not oblige the Board to conduct a hearing." *Id.* at 402.

Here, we face a similar situation but with fewer negative facts. Although City Wide has asserted that several employees had a vague fear that the company had somehow

subverted the election, it has not put forth facts showing that there was a real basis for that fear. Therefore, just as an evidentiary hearing was not obligatory in *Lovejoy*, it is not required here.

City Wide misplaces its reliance on *NLRB v. Superior of Mo., Inc.*, 233 F.3d 547 (8th Cir. 2002) for the contrary proposition. In *Superior*, the representation election was delayed one week because of the NLRB's negligence, and someone spread a rumor that the employer bribed the Board not to hold the election. The Eighth Circuit concluded that a hearing was necessary to determine whether the union took advantage of the circumstances and there was resulting prejudice against the employer. *See id.* at 552. As the Eighth Circuit reasoned, "the Union made no effort to advise employees of the Board agent's mistake. Without a hearing, we cannot know whether Union organizers or supporters helped fuel the rumor to Superior's disadvantage." *Id.* at 551.

This case is distinguishable from *Superior*. Here, Martin's affidavit states that, "approximately on November 24, 2002, the Union told [him] that the election did not happen because the government had written down the wrong date." Helm's affidavit likewise shows that, before the election he "learned that the Board Agent failed to appear" on November 20, and that was why the election was postponed. There is no allegation that the Union did anything to cast aspersions on City Wide. Quite the contrary: City Wide's own evidence shows that the Union not only did not try to exploit the situation, but that it told employees who asked that the delay was not the employer's fault.

Even if this case were not factually distinguishable from *Superior*, as a matter of law we would not follow *Superior*. The Eighth Circuit, unlike this court, reviews the decision not to hold a hearing de novo. *Id.* at 550. Reviewing the

decision for substantial evidence, as we must under our precedent, we owe much more deference to the Board's decision.

We conclude that a reasonable mind could find that the issues of fact in this case were not "substantial and material" and that a hearing was thus unnecessary. The Board faced a close call regarding whether to grant a hearing and thus, given our deferential standard of review, we will not disturb that decision.

### III.

The Board applied the laboratory conditions doctrine, and its decision thus has a reasonable basis in law. Its factual conclusions that the election provided the employees with a fair choice and that an evidentiary hearing was not needed are supported by substantial evidence. We therefore enforce the Board's order.

FLAUM, *Chief Judge*, dissenting.  I am unable to join the majority's opinion because I conclude that the Board's acknowledged election irregularity coupled with City Wide's allegations of resulting irrational voting behavior are sufficient to support a prima facie showing of objectionable conduct, *see NLRB v. Service American Corp.*, 841 F.2d 191, 195 (7th Cir. 1988), and that the Board's conclusion that an evidentiary hearing was not warranted is not supported by substantial evidence, even in light of our deferential standard of review.

The majority suggests that Board precedent recognizes a prima facie showing of objectionable conduct by a Board agent only in two instances; first, when election irregularities have created the potential for employee disenfranchisement or second, when Board agents have engaged in conduct that creates an inference of Board partiality. I do not read Board precedent to be so limited.

The Board charges itself with creating conditions for elections that are as "ideal as possible," and it commits itself to maintaining that standard by subjecting questionable elections to searching administrative review. *General Shoe Corp.*, 77 NLRB 124, 127 (1948). According to the Board, election conditions have been sufficiently objectionable when, due to Board malfeasance or nonfeasance, the election undermined the employer's or employees' confidence in the Board's capacity to run an fair election. For example, the Board has found that its conduct has fallen below the *General Shoe* standard when Board agents have unexpectedly shortened the employees' opportunity to vote. *See Nyack Hosp.*, 238 NLRB 257, 258-59 (1978) (setting aside election because Board agent was over one hour late in opening the polls); *Kerona Plastics Extrusion Co.*, 196 NLRB 1120 (1972) (setting aside election because the Board agent closed the polls early giving rise to prejudice against the employer which "affected votes cast"); *B & B Better Baked Foods, Inc.*, 208 NLRB 493 (1974) (setting aside election because Board agent opened the polls forty minutes late and may have affected the result of the election). Just as a delayed opening or premature closure of the polls suggests that the Board has failed to comport with the *General Shoe* standard, so should a complete failure to open the polls on the scheduled election day. The result of an abbreviated election is much like that of a cancelled election, in that the Board agent's unexpected deviation from the election schedule creates uncertainty and the potential for unsubstantiated rumor. Indeed, the harm

resulting from the Board's combined failure to appear for the November 20 election and failure to inform the employees that City Wide was not responsible for the cancellation is strikingly similar to the harm that the Kerona Plastics Extrusion Company claimed resulted from the Board's premature closure of the polls: "rumors creat[ing] an atmosphere of confusion, bias, and prejudice against the Employer, which affected votes case in the [later election]." *Kerona Plastics*, 196 NLRB at 1120. As the Board acknowledged in *Kerona Plastics*, an election conducted in the wake of Board error, where employees are circulating inaccurate rumors of employer wrongdoing, undermines the appearance of a fair election and should be set aside.

City Wide has alleged that the cancellation of the November 20 election engendered suspicion that City Wide had subverted the election process and that rumors led to irrational voting. Further, City Wide has submitted five affidavits testifying to the prejudice City Wide allegedly suffered due to employee confusion regarding the cancellation. Specifically, the branch manager testified in his affidavit that the employees were shocked, confused, and "pissed off" due to the postponement of the election. The branch manager's testimony was confirmed by the affidavits of other City Wide employees: Casillas stated that employees were angry about the delay; Duenas stated that he and 13 other employees were "confused and/or surprised when we did not have a chance to vote." In their affidavits, Casillas and Rodriguez stated that some employees changed their votes after the first election was postponed. Helm testified in his affidavit that "[i]t is human nature to think that the company somehow fixed the election process." Additionally, City Wide has proffered that nine other employees would testify to the presence of rumors if the Board ordered an evidentiary hearing.

In my view, if City Wide could establish at an evidentiary hearing that the Board's failure to inform City Wide's

employees that their employer had not caused the cancellation of the November 20 election had an effect on the outcome of the November 26 election, City Wide would have demonstrated sufficient objectionable conduct to merit the setting aside of the election. *See General Shoe Corp.*, 77 NLRB 124 (1948); *B & B Better Baked Foods, Inc.*, 208 NLRB 493 (1974); *Kerona Plastics Extrusion Co.*, 196 NLRB 1120 (1972). City Wide has met its burden of "rais[ing] substantial and material factual issues" sufficient to support a prima facie showing of objectionable conduct, *see* 29 CFR § 102.69(d), and it is my opinion that the Board's conclusion to the contrary is not entitled to our traditional deferential approach.

Finally, I believe that *NLRB v. Lovejoy Indus., Inc.*, 904 F.2d 397 (7th Cir. 1990) is not as instructive as the majority suggests. In *Lovejoy*, the Board found that no election error had occurred; that is, the Board concluded that the employer's allegations of voter intimidation were insufficient as a matter of law to state a claim for voter intimidation. *Id.* at 402. In contrast, in this case, the Board has admitted that it failed to hold a scheduled election, and it has further acknowledged that it did not inform City Wide's employees that their employer was not to blame for the cancellation. Under Board precedent and the law of this Circuit, a failure of a Board agent to inform employee voters of their employer's blamelessness when Board error has necessitated a new election is an election error meriting that the election results be set aside. *NLRB v. Fresh'nd-Aire Co.*, 226 F.2d 737 (7th Cir. 1955). The Board has continued to recognize the potential influence of Board error on the fairness of elections, as is indicated by the Board's order in this case that "it would be preferable for Regional Offices to include in any notice of rescheduled election a statement that the election has been rescheduled for administrative reasons beyond the control of the employer or the union." *City Wide Insulation of Madison, Inc. d/b/a/ Builders' Insulation,*

*Inc.*, 338 NLRB 108 (2003). Therefore, it is my judgment that the Board's finding that City Wide did not allege "substantial and material factual issues" sufficient to support a prima facie showing of objectionable conduct, notwithstanding the Board's last-minute cancellation of the election and City Wide's proffered testimony and affidavits attesting to the resulting irrational employee voting, was in error and was not supported by substantial evidence. I respectfully dissent.

A true Copy:

      Teste:

                          _____
                          *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*