In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

Nos. 16-3617 & 16-3671

HANSON COLD STORAGE COMPANY OF INDIANA d/b/a HANSON
LOGISTICS,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

———————————

On Petition for Review and Cross-Application for Enforcement of an
Order of the National Labor Relations Board.
No. 13-CA-178619.

———————————

ARGUED MARCH 28, 2017 — DECIDED JUNE 20, 2017

———————————

Before FLAUM, KANNE, and HAMILTON, *Circuit Judges*.

KANNE, *Circuit Judge*. Thirty-seven employees of an Indiana employer voted in a union-representation election. The employer and the union disputed two of the votes, a sufficient number to affect the outcome of the election. The employer argued that one vote should not count, claiming that the voter's intent could not be discerned from the ballot; the union argued that another vote should not count, claiming

that the voter was not employed by the employer at the time of the vote. The National Labor Relations Board rejected the employer's argument and counted the first disputed vote as a vote in favor of representation. The Board then concluded that the second disputed vote was no longer outcome determinative of the election. So it dismissed that dispute as moot and certified the union.

The parties now contest the Board's counting of the first disputed vote, a dispute that turns on the intent of a voter who produced a hopelessly unclear ballot. Because we find it impossible to divine the voter's intent from the face of the ballot, we hold that the Board abused its discretion by counting that vote. We further hold that the Board erred by dismissing as moot the union's challenge to the second disputed vote.

## I. BACKGROUND

Hanson Logistics is one of the leading providers of public-refrigerated warehousing and transportation services in the Midwest. It employs dozens of workers at its facilities in Michigan and Indiana. On February 4, 2016, the International Brotherhood of Teamsters Union Local No. 142 filed a petition to be the exclusive collective-bargaining representative for a subset of Hanson's employees. (App. 5.)[1] Specifically, Local 142 sought to represent Hanson's "full-time and regu-

---

[1] Throughout our opinion, we cite to the appendix in Hanson's opening brief. We include these citations in parentheses. Our reference to "App." in these citations refers to this appendix, and the first number following that reference refers to the specific "Tab" in the appendix to which we are referring. Any additional numbers included in these citations refer to the specific page numbers within that Tab of the appendix.

lar part-time warehousemen, dockworkers, pickers, runners, team leads, inventory workers and maintenance workers employed by [Hanson] at its facility currently located at 2201 Northwind Parkway, Hobart, Indiana 46342." (App. 6 at 2.)[2] Pursuant to a stipulated election agreement between Hanson and Local 142, on February 29, 2016, the Board conducted an election at Hanson's Hobart facility to determine whether Local 142 would represent those employees. The notice of election stated that "[a] majority of the valid ballots cast will determine the results of the election." (App. 6 at 1.) The ballot instructed each voting employee to "mark an 'X' in the square of your choice." (App. 6 at 2.)

Thirty-seven employees each cast a ballot in the election. Hanson and Local 142 did not dispute thirty-five of those ballots, eighteen cast in favor of Local 142's representation and seventeen cast against it. Instead, the parties disputed the validity of the two other ballots. Hanson contested a vote cast by an unknown voter ("Unknown Voter Ballot"), arguing that the unknown voter's intent was unclear from the markings on the ballot. And Local 142 contested a vote cast by a voter named Lawrence Kelly ("Lawrence Kelly Ballot"), arguing that Kelly was not a Hanson employee at the time of the vote. Because the two disputed votes were outcome determinative of the election, the Board's Field Examiner ordered Hanson and Local 142 to submit offers of proof, including relevant legal authority, as to the votes' validity.

---

[2] Local 142 did not seek to represent Hanson's "[d]rivers, WMS coordinators, office clerical employees and guards, professional employees and supervisors." (App. 6 at 2.)

Both parties complied with the Field Examiner's order, and the Board's Acting Regional Director—Daniel Nelson—considered the parties' challenges. On March 25, 2016, Nelson issued a decision overruling Hanson's challenge to the Unknown Voter Ballot. In so doing, Nelson counted the Unknown Voter Ballot as a vote in favor of Local 142's representation, increasing the vote count from 18–17 to 19–17 in favor of Local 142's representation. Because Local 142's challenge to the Lawrence Kelly Ballot was no longer outcome determinative, Nelson dismissed that challenge as moot. He then certified Local 142 as the exclusive collective-bargaining representative of the aforementioned subset of Hanson's employees. Hanson filed a request for review with the Board. But on May 26, 2016, the Board summarily denied that request, finding that Hanson raised "no substantial issues warranting review." (App. 4.)

Nearly two weeks later, on June 6, 2016, Local 142 sent a letter to Hanson requesting recognition of Local 142 as the exclusive collective-bargaining representative of the applicable subset of Hanson's employees. Hanson responded in a letter that it would "not recognize Local No. 142 as the representative of any of its employees" because it "believe[d] that the Region incorrectly decided the challenged ballots from the February 29, 2016 election." (App. 15.) Three days later, on June 20, 2016, Hanson filed a charge with the Board alleging that Hanson "ha[d] failed to bargain in good faith with the Union." (App. 16.)

On July 12, 2016, the Regional Director issued a complaint against Hanson, alleging that Hanson had violated section 8(a)(1) and (5) of the National Labor Relations Act—29 U.S.C. § 158(a)(1), (5)—by refusing to recognize and bar-

gain with Local 142. Hanson responded to the complaint by again denying that Local 142 was the exclusive collective-bargaining representative. Counsel for the Board then filed a motion to transfer proceedings to the Board and a motion for summary judgment. On September 13, 2016, the Board issued an order affirming Nelson's certification of Local 142 as the exclusive collective-bargaining representative and holding that Hanson's refusal to bargain with Local 142 constituted an unfair labor practice. Hanson then filed a petition for review of the Board's decision in this court, and the Board filed a cross-application for enforcement of its order.

## II. ANALYSIS

We begin with a note on our jurisdiction. An employer's path to judicial review of a Board's decision upholding an election and certifying a union is "circuitous." *N.L.R.B. v. Serv. Am. Corp.*, 841 F.2d 191, 193 n.3 (7th Cir. 1988). Because Board-certification decisions are not immediately-appealable orders, an employer can obtain judicial review of them only "in conjunction with an unfair labor practice order by the Board," which *is* immediately appealable. *Heartland Human Servs. v. N.L.R.B.*, 746 F.3d 802, 805 (7th Cir. 2014). Thus, an employer who wants judicial review of a Board's certification decision must first affirmatively refuse to bargain with the Board-certified union, "thereby exposing itself to an unfair labor practice charge"; then wait for the union to file that charge with the Board; and then wait for the Board to hold that the employer committed an unfair labor practice by refusing to bargain with the union. *Serv. Am. Corp.*, 841 F.2d at 193 n.3. Only then can we review the Board's underlying certification decision. *Ruan Transp. Corp. v. N.L.R.B.*, 674 F.3d 672, 674 (7th Cir. 2012).

As discussed above, Hanson followed this procedure. Hanson admits that it refused to bargain with Local 142 and therefore conditionally admits to the charged unfair labor practice; even so, Hanson continues to contest the validity of the union's certification. Because the Board found that Hanson had committed an unfair labor practice, we can review Hanson's underlying certification challenges. But our review in these cases is limited: "[w]e presume the validity of a Board-supervised election and will affirm the Board's certification of a union if that decision is supported by substantial evidence." *N.L.R.B. v. AmeriCold Logistics, Inc.*, 214 F.3d 935, 937 (7th Cir. 2000). When the Board's interpretation of a particular outcome-determinative ballot is at issue, as it is here, "[w]e give deference to the Board's interpretation of [that] ballot and will reverse only for abuse of discretion." *Id.* at 939.

Turning to the merits, Hanson argues that the Board erred in two major respects. First, it argues that the Board abused its discretion by counting the Unknown Voter Ballot as a vote in favor of Local 142's representation. Second, Hanson contends that the Board erred by dismissing as moot Local 142's challenge to the Lawrence Kelly Ballot. The Board seeks enforcement of its order. We first address Hanson's argument regarding the Unknown Voter Ballot before turning to its argument regarding the Lawrence Kelly Ballot.

*A. Unknown Voter Ballot*

The official secret ballot used in Hanson's representation election contained a clear instruction: "mark an 'X' in the square of your choice." Beneath that instruction were two boxes, one marked "Yes," the other marked "No." Nearly all of the voters who participated in the election followed the

ballot's simple instruction, marking an X in the box of their choosing and including no other markings on the ballot. But the anonymous voter who submitted the Unknown Voter Ballot did not heed the instruction. Instead, that voter marked a large "X"—which touched the "Yes" box but also extended far outside of it—along with indecipherable scribbling both inside and outside of the box. It is unclear which came first, the "X" or the scribbles, and the parties admit that the voter's intent in including the scribbles is unclear: the voter may have included them either to void or to emphasize the vote. Here is a picture of the Unknown Voter Ballot for reference.



Despite this lack of clarity, Acting Regional Director Nelson counted the Unknown Voter Ballot as a "Yes" vote in favor of Local 142's representation. In so doing, Nelson first cited the "Board's longstanding policy" of attempting "to give effect to voter intent whenever possible." (App. 12 at 2 (citing *Hydro Conduit Corp.*, 260 N.L.R.B. 1352, 1352 (1982)).) He then applied a presumption from a 1982 Board decision,

*Kaufman's Bakery, Inc.*, in which the Board "regard[ed] a mark in only one box, despite some irregularity, as presumptively a clear indication of the intent of the voter." 264 N.L.R.B. 225, 225 (1982). In that decision, the Board reasoned that,

> When a ballot reveals a clear "X" almost entirely contained within either the "Yes" box or the "No" box and no irregular markings appear outside the marked box, there can be little doubt but that the voter intends his vote to be counted in favor of or against, respectively, the designated labor organization.

*Id.* Because the Unknown Voter Ballot contained markings in only one box—the "Yes" box—Nelson applied *Kaufman's Bakery* and presumed that the unknown voter intended to vote in favor of Local 142. The Board affirmed Nelson's decision.

Hanson argues that this was an abuse of discretion. We agree. Both the Board's overarching policy and the rule in this circuit in ballot interpretation cases "is to count ballots when the voters' intent is *clear*, despite irregularities in the manner in which the ballots have been marked." *Ruan Transp.*, 674 F.3d at 675 (emphasis added) (quoting *AmeriCold Logistics*, 214 F.3d at 939). As we and the Board have noted, voter intent is the touchstone in these cases.

In addressing its policy "to give effect to voter intent whenever possible," the Board has stated that it "will count a ballot where, despite an irregularity in the manner in which it has been marked, it *clearly expresses the voter's intent*." *Brooks Bros., Inc.*, 316 N.L.R.B. 176, 176 (1995) (emphasis added); *see also J.L.P. Vending Co., Inc.*, 218 N.L.R.B. 794,

795 (1975) (noting that the Board's "object" in these types of cases "has always been one of ascertaining the voter's intentions"); *Mercy College*, 212 N.L.R.B. 925, 925 (1974) ("In finding a ballot to be valid the Board requires that the intent of the voter in marking his ballot must be clearly expressed."). But "it is not the Board's role to glean voter intent from ambiguous or contradictory markings on a ballot." *In re Daimler-Chrysler Corp.*, 338 N.L.R.B. 982, 983 (2003). Thus, the Board will not speculate "to divine the intent of a ballot that is not clear," or "to negate the intent of a ballot that is otherwise clear." *Id.* Instead, when the voter fails to "ma[ke] his or her preference clear" on the face of the ballot, then the ballot "*must* be voided." *Id.* (emphasis added); *see also Weill's Inc.*, 108 N.L.R.B. 731, 734 (1954).

Here, rather than treat a seemingly unclear ballot as void, the Board applied *Kaufman's Bakery* to presume that the voter intended to vote. But we aren't even convinced that *Kaufman's Bakery* should have been applied in this case. By its terms, the presumption applies only when the ballot "reveals a clear 'X' almost entirely contained within" one of the boxes and "no irregular markings appear outside the marked box." *Kaufman's Bakery*, 264 N.L.R.B. at 225. The "X" that appears in the "Yes" box of the Unknown Voter Ballot can hardly be described as "clear," given that the scribbling covers much of the "X." Moreover, the "X" is not "almost entirely contained within" the "Yes" box and much of the scribbling—the "irregular markings" in this case—appears outside of that box.

But even if we thought the presumption ought to apply here, we think it is overcome by the circumstances. The Board urges us to strictly apply *Kaufman's Bakery:* it contends

that in *every* situation where there are markings in only one box, we should presume that the voter intended to cast a vote for that box. Thus, under this strict interpretation—and as argued by the Board at oral argument—a ballot that contains only a question mark in one of the boxes and nothing in the other box would have to be counted as a vote for the box that contained the question mark. That can't be right if the Board's overarching goal in these cases is to discern and effectuate the voter's intent: a ballot that contains only a question mark provides absolutely no indication of how the voter intended to vote. The same is true of a ballot that contains an "X" that may or may not have been scribbled out.

As the Board conceded at oral argument, the markings matter in these cases. When, as here, the irregular markings on the disputed ballot could reasonably be interpreted as an attempt to void the ballot, those markings should not be ignored. Although the Board argues that it addressed this exact concern in *Kaufman's Bakery*—in which the Board described as "unlikely" a voter's strategy of attempting to cancel his selection and cast a "no-choice" vote by "drawing irregular marks over his original 'X'"—it did so in reference to "stray marks" that constituted "the slightest variance from the normal manner of ballot marking" despite a clear indication of the voter's intent on that ballot. 264 N.L.R.B. at 225. Here, as discussed above, the markings on the Unknown Voter Ballot give no clear indication of the voter's intent to vote, and the scribbles are not merely stray marks but easily could (and maybe should under the circumstances) be interpreted as an outright attempt to void the voter's vote. Simply put, the *Kaufman's Bakery* presumption is ill-suited to deal with situations like these, where voter intent absolutely cannot be inferred from the marks on the ballot.

In sum, we think it is impossible—with or without a presumption—to determine the intent of the unknown voter in this case. Nelson and the Board should have treated the Unknown Voter Ballot as void. We hold that their failure to do so was an abuse of discretion.

*B. Lawrence Kelly Ballot*

Local 142 challenged the Lawrence Kelly Ballot on the ground that Kelly—an employee of Hanson who had been absent from work for at least seven months on approved medical leave—was no longer a Hanson employee and was therefore ineligible to vote in the election. Because Nelson counted the Unknown Voter Ballot as a vote in favor of Local 142's representation, he determined that Local 142's challenge to the Lawrence Kelly Ballot was no longer outcome determinative of the election. As such, Nelson deemed that challenge to be moot, and the Board affirmed this decision. That too was an error.

As discussed above, the Unknown Voter Ballot should not have been counted as a vote in favor of Local 142's representation. Thus, the vote tally should have stood at 18–17, with Local 142's dispute to the Lawrence Kelly Ballot outstanding. Because employers win all ties in representation elections, the Lawrence Kelly Ballot *is* outcome determinative. *AmeriCold Logistics*, 214 F.3d at 937 ("[L]ike a base runner who reaches the bag at the same time as the ball, a tie goes to the company."). Nelson and the Board should have considered Local 142's dispute to the Lawrence Kelly Ballot.[3]

---

[3] Although Nelson ultimately determined that Local 142's challenge to the Lawrence Kelly Ballot was moot, he did discuss the governing legal

(continued…)

**III. CONCLUSION**

For the foregoing reasons, we VACATE the Board's certi-fication decision; DENY the Board's cross-application for en-forcement of its unfair-labor practice order; and REMAND for proceedings consistent with this opinion.

---

(…continued)

standard (and did hint at the likely result in this case) in a footnote of his decision:

> [T]he fundamental rule governing the eligibility of an employee on sick or maternity leave, known as the "*Red Arrow* test," is that he or she is presumed to continue in such status unless and until the presumption is rebutted by an affirmative showing that the employee has been discharged or has resigned.

(App. 12 at 2 n.1 (citing *Red Arrow Freight Lines*, 278 N.L.R.B. 965, 965 (1986)).).