In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 17-2042 & 17-2111

JAM PRODUCTIONS, LTD., EVENT
PRODUCTIONS, INC., STANDING ROOM
ONLY, INC., and VICTORIA OPERATING
CO.,

*Petitioners, Cross-Respondents*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent, Cross-Petitioner,*

*and*

THEATRICAL STAGE EMPLOYEES
UNION, LOCAL NO. 2 I.A.T.S.E.,

*Intervenor-Respondent.*

_____

Petition for Review and Cross-Application for Enforcement of an
Order of the National Labor Relations Board.
No. NLRB-1, No. 13-CA-186575

_____

ARGUED DECEMBER 8, 2017 — DECIDED JUNE 28, 2018

_____

Before KANNE and ROVNER, *Circuit Judges*, and DURKIN, *District Judge*.[*]

ROVNER, *Circuit Judge.* The National Labor Relations Board ("the Board") seeks to enforce its order requiring Jam Productions, Ltd., Event Productions, Inc., Standing Room Only, Inc., and Victoria Operating Co. (collectively "Jam Productions" or "Jam") to bargain with the Theatrical Stage Employees Union Local No. 2, ("Local No. 2"). Jam argues that in the period before the election to determine whether Local No. 2 would represent Jam employees, the union attempted to influence the election outcome by steering premium union jobs to Jam employees. We have jurisdiction to review the Board's application for enforcement pursuant to 29 U.S.C. § 160(e). Because Jam presented enough evidence to warrant a hearing on the validity of the election results, we deny enforcement and remand for an evidentiary hearing.

## I.

In mid-September 2015, Local No. 2 filed an election petition to represent employees of Jam Productions as a single employer. Jam produces concerts, shows, and events at venues in and around Chicago, including the Riviera Theatre, Park West Theatre, and Vic Theatre. In conjunction with these productions, Jam hires part-time and non-union stagehands to unload lighting and sound equipment into the venue, set it up, maintain it, take it down, and move it out of the venue after the show. Given the irregular schedule of shows at any given

---

[*] Of the Northern District of Illinois, sitting by designation.

venue (shows followed by days or weeks without performances) and the fact that one venue (the Riviera) was closed for the entire summer because it lacks air conditioning, none of the stagehands are employed full time and their employment is generally sporadic.

On September 30, Jam and Local No. 2 entered into a Stipulated Election Agreement identifying the potential bargaining unit as stagehands at the Riviera, Vic, and Park West Theatres employed during the payroll period ending on October 4, 2015. The unit was defined more specifically as: "All full-time and regular part-time stage production employees employed by the Employer at the Riviera, Park West, and Vic Theatres, but excluding production managers and crew leaders, office clerical employees and guards, professional employees and supervisors as defined in the Act." Given the sporadic nature of the work, the parties agreed to add the following additional definition to the Agreement: "Also eligible to vote are all employees in the unit who have been employed by the Employer for a total of 18 concerts, shows, and/or events over a 1-year period immediately preceding the eligibility date."

The day after the parties signed the Election Agreement, however, the representation petition was held in abeyance pending the investigation of an unfair labor practice charge that Local No. 2 had filed only the day before it filed its representation petition. Local No. 2's charge was based on Jam's termination of the Riviera's crew leader, Chris Shaw and the fifty-three employees he supervised (the "Shaw crew"). The unfair labor practice charge was not resolved until April 6, 2016, when the Board's Acting Regional Director approved an

agreement containing a non-admissions clause and providing that Jam would reinstate the terminated employees by offering them immediate and full participation in Jam's "on-call list."

Just over a month after the unfair-labor-practice charge was resolved, on May 16, 2016, the election was held. Prior to the election, Jam had asked the Regional Director to move the eligibility date of the election back two weeks on account of the seven-month election delay. The Regional Director did not issue an order in response, so Jam included on its voter eligibility list five stagehands hired in the two-week period after the agreed-upon October 4, 2015 date, along with a notation about their hiring date. Local No. 2 prevailed with twenty-two votes in its favor and ten against; the victory was not entirely decisive, however, because there were an additional twenty-one ballots challenged by either Jam or Local No. 2. Eight of the challenges were uncontested, which left thirteen contested ballots—all union challenges contested by Jam. Five of those were the ballots cast by the employees who had been hired in the two weeks following the stipulated eligibility date. Local No. 2 challenged the remaining eight ballots on various grounds such as number of shows worked and whether the voting employees were in fact "supervisors" ineligible to vote.

Jam also timely filed an objection contesting the election results on the grounds that Local No. 2 unlawfully provided economic benefits to employees during the critical period preceding the election. Specifically, Jam alleged that Local No. 2 provided employees premium, higher-paid work at union venues in the weeks before the election in an attempt to

influence the employees—particularly the Shaw crew—to vote for the union.

In response to Jam's objections, the Board's Acting Regional Director conducted an investigation and issued a Corrected Report on June 20, 2016, concluding that Jam's offer of proof in support of its objection fell short of demonstrating the required "substantial and material factual issues," *see Park Chevrolet-Geo, Inc.*, 308 NLRB 1010, fn. 1 (1992), that, if proven, would warrant setting aside the election. Specifically, the Director concluded that although Jam had shown that employees did work union jobs during the critical period, it had not shown that Local No. 2 engaged in any wrongdoing by hiring those employees through its open referral system. The report further concluded that Jam's evidence of an undeserved financial benefit was too speculative to support its claim that Local No. 2 engaged in wrongdoing. As relevant here, the Director also sustained Local No. 2's challenges to the ballots of four of the five employees hired in the two weeks after the original eligibility date,[1] and certified Local No. 2 as the employees' bargaining agent.

Jam filed a request for review, and on January 5, 2017, a three-member panel of the NLRB denied Jam's request and affirmed the Regional Director's Corrected Report certifying

---

[1] The Regional Director sustained twelve union challenges in all: four employees hired after the original eligibility date and eight employees who had not worked the requisite number of shows as defined by the eligibility agreement. Because the nine remaining ballots would be insufficient to impact the election results, the Regional Director did not consider those challenges.

Local No. 2 as the relevant bargaining unit. On the issue of challenged ballots, one member of the panel would have overruled the four Local No. 2 ballot challenges to employees hired after the eligibility date. The dissenting panel member reasoned that the delay occasioned by the Board's resolution of the unfair labor practice prevented the Board from enforcing other material terms of the Election Agreement like the eligibility date; he also noted that there was no prejudice to Local No. 2 because Jam provided proper notice as to those four employees. He would have, however, denied Jam's request for review of five additional union challenges, so the four ballots he would have allowed would not have impacted the election's outcome.

Jam then refused to recognize or engage in collective bargaining with Local No. 2, prompting the Board's general counsel to file a complaint alleging an unfair labor practice in violation of § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5). In its answer to the complaint, Jam repeated its objections and challenges to the certification of the election, but the Board rejected Jam's affirmative defenses and issued an order holding that Jam's refusal to bargain amounted to an unfair labor practice. *See id.* Jam timely petitioned for review of the Board's order compelling it to bargain, and the Board cross-applied for its enforcement.

## II.

Because Jam refused Local No. 2's request to enter into collective bargaining, the central issue on appeal is whether the Board reasonably certified Local No. 2 as the Jam employees'

representative. As detailed above, an employer's path to judicial review of a Board's decision upholding an election and certifying a union is "circuitous." *Hanson Cold Storage Co. v. NLRB*, 860 F.3d 911, 914 (7th Cir. 2017) (quoting *NLRB v. Serv. Am. Corp.*, 841 F.2d 191, 193 n.3 (7th Cir. 1988)). Unlike an unfair labor practice order by the Board, Board-certification decisions are not immediately appealable. Thus, an employer seeking judicial review must, as Jam did here, expose itself to an unfair labor practice charge by refusing to bargain with the Board-certified union. Only once Local No. 2 files an unfair labor practice charge that is sustained by the Board can we review the Board's underlying certification decision. *See id.* (describing process for employer to obtain judicial review of Board's decision upholding election and certifying union); *see also Ruan Transp. Corp. v. NLRB*, 674 F.3d 672, 674 (7th Cir. 2012).

We have jurisdiction under 29 U.S.C. §§ 160(e) and (f) over Jam's petition for review of the Board's May 16, 2017 decision. *See*, *e.g.*, *NLRB v. City Wide Insulation, Inc.*, 370 F.3d 654, 657 (7th Cir. 2004). If the Board acted reasonably in certifying Local No. 2, we will uphold the Board's enforcement of its order compelling Jam to enter into collective bargaining. *See NLRB v. River City Elevator Co., Inc.*, 289 F.3d 1029, 1032 (7th Cir. 2002). We review factual conclusions by the Board to ensure that they are supported by "substantial evidence" and expect its legal conclusions to have a "reasonable basis in law." *City Wide Insulation*, 370 F.3d at 657. Both standards are deferential; the Board's factual conclusions are supported by substantial evidence when they are based on "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 502–03 (7th Cir. 2003) (internal quotations and citation omitted); *NLRB v. O'Daniel Trucking Co.*, 23 F.3d 1144, 1148 (7th Cir. 1994) (same). We review the Board's determination not to hold a hearing on an employer's objections under the same substantial evidence standard. *Clearwater Transport, Inc. v. NLRB*, 133 F.3d 1004, 1008 (7th Cir. 1998).

Jam's primary argument on appeal is that the Board erred in certifying the election results without holding a hearing on its objections. Specifically, Jam challenges the Board's determination that Local No. 2 work given to the Shaw crew preceding the election did not make the election unfair.

Here, Jam contends that Local No. 2 engaged in a concerted effort to steer high-paying union jobs to the twenty-one voting members of the recently reinstated Shaw crew (whose votes made up a majority of the counted votes). Jam submitted an offer of proof outlining multiple instances in the critical period before the election (between April and the first half of May 2016) where Local No. 2 chose members of the Shaw crew to work shows Jam alleged would have ordinarily been staffed by Local No. 2 Union members.

Local No. 2 selects stagehands for shows through an "automated call steward" system accessible through its web site. Individuals could log in to the automated system, where they filled out a member profile describing their applicable job classifications and availability. Stagehands then received job offers via text, and simply replied to confirm or deny offers.

To support its theory, Jam submitted the anticipated testimony of Behrad Emami, the production manager at the

Riviera Theatre, and Eric Linz, a runner who worked at a David Gilmour show at the Auditorium Theater on April 5. Based on telephone conversations and text messages (attached to Jam's proffer), Emami would have testified to a number of interactions with the members of the Shaw crew who were unavailable to work or attend meetings at the Riviera because they were working at union venues during the critical period. Emami was prepared to testify that of the twenty-one voting members of the Shaw crew, at least thirteen were hired to work union shows during the critical period, including the David Gilmour show at the Auditorium Theatre on April 5 and 6; the Rihanna show at the United Center from April 14 to 16; the NFL Draft in Grant Park from April 28 to 30; and the stage set up at Northerly Island at the beginning of May. Eric Linz would have testified that he had seen at least six members of the Shaw crew while he was working as a runner at the David Gilmour show, including two more not included in the thirteen listed by Emami.

Jam also offered its own records from shows it produced at union venues[2] demonstrating that when Local No. 2 had supplied stagehands for Jam outside the critical period, it did not hire non-union employees. Jam's records demonstrated that at three large productions at the United Center outside the critical period—January 13 (a Muse concert with 129 stage-hands), January 19 (a Bruce Springsteen concert with 109 stagehands), and February 17 (an AC/DC concert with 116

---

[2] In addition to the Riviera, Vic, and Park West Theatres, Jam occasionally produced shows at union venues. For those shows Local No. 2 typically provided the stagehands.

stagehands)—Local No. 2 did not hire any members of the Shaw crew. And Jam identified (as a hostile witness) the individual on the Shaw crew, Justin Hoffman, who it believed helped coordinate the plan to offer union jobs. Finally, Jam sought employment records from Local No. 2 for the twenty-one voting employees of the Shaw crew so that Jam could demonstrate that it was unusual for the Shaw crew to have received union jobs.

Local No. 2 refused to provide any of the requested records, and the Regional Director declined to interview any of the individuals identified in the offer of proof or require Local No. 2 to turn over any business records. In rejecting Jam's request for a hearing, the Regional Director acknowledged that the Shaw crew had received union jobs during the critical period, but concluded that Jam had not demonstrated that Local No. 2 made a gift of "tangible economic value" to garner union votes.

The Regional Director is obligated to hold a hearing only when the objecting party raises "substantial and material factual issues" sufficient to support a prima facie showing of objectionable conduct. *Clearwater Transport*, 133 F.3d at 1011 (quoting *NLRB v. Lake Holiday Assoc., Inc.*, 930 F.2d 1231, 1236–37 (7th Cir. 1991)); 29 C.F.R. § 102.69(c)(1)(i). Jam could meet its burden by alleging misconduct that, if proven, would warrant setting aside the election under the substantive law of representation elections. *See, e.g.*, *NLRB v. AmeriCold Logistics, Inc.*, 214 F.3d 935, 938 (7th Cir. 2000) ("The NLRB must hold a hearing when the employer makes a prima facie showing of misconduct that would be sufficient to set aside the election.");

*see also Serv. Am. Corp.*, 841 F.2d at 195; *Clearwater Transport,* 133 F.3d at 1011.

Although the standard of review is deferential, we believe Jam presented enough evidence to obtain an evidentiary hearing, and that the Board abused its discretion by failing to hold one. When conducting a representation election, the Board has wide discretion to "ensure the fair and free choice" of bargaining representatives by employees. *NLRB v. Savair Mfg. Co.* 414 U.S. 270, 276–77 (1973). This obligation to ensure fair and free choice includes a prohibition on campaign tactics by either the employer or the union that induce workers to cast their votes on grounds other than the advantages and disadvantages of union representation. *See id.* ("We do not believe that the statutory policy of fair elections … permits endorsements, whether for or against the union, to be bought and sold in this fashion."); *see also Freund Banking Co. v. NLRB*, 165 F.3d 928, 931 (D.C. Cir. 1999). Not only does the Act forbid employers from utilizing threats or rewards as campaign tactics, it prohibits "both crude *and subtle forms of vote-buying*" by the union. *Freund*, 165 F.3d at 931 (emphasis added). Thus, a union is barred from both blatantly giving something of value to an employee in exchange for his vote as well as offering a benefit in a way that "tacitly obliges the employee" to vote for the union. *Id.* (citing *Savair*, 414 U.S. at 277–78).

In considering whether a particular incentive taints the fairness of the election, we ask whether what is offered is "'sufficiently valuable and desirable in the eyes of the person to whom they are offered, to have the potential to influence that person's vote?'" *River City Elevator*, 289 F.3d at 1033

(quoting *Nestle Ice Cream Co. v. NLRB*, 46 F.3d 578, 583 (6th Cir. 1995)). Specifically, the Board has held that a union is forbidden from providing voters anything of "tangible economic benefit" during the critical period before the election. *See King Elec., Inc. v. NLRB*, 440 F.3d 471, 474 (D.C. Cir. 2006) (quoting *Freund*, 165 F.3d at 931–32); *see also Mailing Servs., Inc.*, 293 NLRB 565, 565–66 (1989)).

The financial benefit of the higher-paying jobs immediately preceding the election could plausibly be seen as an economic inducement to secure votes in favor of Local No. 2. The NLRB has refused to certify elections where a union has offered benefits to employees of similar or lesser value than the premium-pay jobs allegedly offered here. *See Owens-Ill., Inc.*, 271 NLRB 1235, 1235–36 (1984) (gift of union jackets); *Mailing Servs.*, 293 NLRB at 566 (free medical screenings offered by union impermissible conferral of benefit); *Wagner Elec. Corp.*, 167 NLRB 532, 533 (1967) (union's gift of life insurance coverage "is a tangible economic benefit").

The Board defends the refusal to investigate or hold a hearing on the grounds that union job referrals "in the ordinary course of its referral system, according to the pre-existing standards and practice" provide no reason to suspect Local No. 2 of using the jobs to induce votes. But whether the jobs were in fact offered to the Shaw crew "according to pre-existing standards and practice" is precisely the question Jam sought to answer with its objection. The Board attacks Jam's offer of proof as nothing more than a fishing expedition, devoid of the type of "specific evidence" about "specific people" required to warrant an evidentiary hearing. *See NLRB*

*v. Service Am. Corp.*, 841 F.2d 191, 195 (7th Cir. 1988). But in describing the alleged deficiencies in Jam's offer of proof, the Board highlights precisely the Catch-22 Jam faced in attempting to demonstrate that the referrals were in fact an aberration from Local No. 2's ordinary referral operating system.

For instance, the Board faults Jam's offer of proof for failing to provide evidence showing (1) Local No. 2's normal referral procedures; (2) whether the voting employees were treated differently than others with access to the referral system; or (3) whether the employees who received Local No. 2 jobs were members of Local No. 2 or not. But these are the very questions Jam sought to have answered with its offer of proof.

As detailed above, Jam provided more than vague, unsubstantiated accusations. Using its own employment records, it compared the likelihood of non-union members receiving union jobs before the critical period to what appeared to be the dramatic increase in availability of union jobs during the critical period. It also identified by name three individuals who could provide further detail about how the referrals were given and which specific employees had received Local No. 2 work. And it requested the very union records that the Board now faults it for failing to produce: Local No. 2's employment records that would have identified union members and shed light on the referral procedures and whether the Shaw crew received different treatment during the critical period.

The Board's primary argument is that Local No. 2 did not engage in objectionable conduct because the referral system was available to non-union members and thus it was unremarkable that the Shaw crew received union work. But that

reasoning begs the question whether, despite the *availability* of the referral system, non-union employees were ever selected for union jobs outside of the critical period. As we noted in *Service American Corporation*, "[t]he whole purpose for the hearing is to inquire into the allegations to determine whether they are meritorious; it makes little sense to expect the employer to prove its case, especially without power of subpoena, to the Regional Director before a hearing will be granted." 841 F.2d at 197 (quoting *NLRB v. J-Wood/A Tappan Div.*, 720 F.2d 309, 315 (3d Cir. 1983)). Because the Regional Director declined to interview either Justin Huffman, who Jam believed was responsible for coordinating jobs for the Shaw crew during the critical period, or any of the twenty-one Shaw crew members identified in Jam's offer of proof, he had no way of knowing if members of Shaw's crew ordinarily received union job offers outside the critical period.

Without subpoena power, Jam produced as much evidence as it had available tending to suggest that non-union voting employees received a sudden increase in offers to work union jobs in the period immediately preceding the election. Although such a benefit may not have formally obligated members of the Shaw crew to vote for Local No. 2, having been the beneficiaries of the premium-pay jobs, members of the Shaw crew may well have felt some duty to return the favor with a union vote. *See Savair*, 414 U.S. at 277 (noting that although an employee may not be "legally bound to vote for the union and has not promised to do so in any formal sense" some "*would feel obliged*" to cast a union vote after having signed a union recognition slip) (emphasis added). This may be especially true if, outside of the critical period, the jobs offered

were rarely, if ever, available for those non-union voting employees.

Given the large pay disparity for union and non-union stagehands, certainly the jobs at union venues during the critical period could be seen as a gift of "tangible economic value." If the jobs were in fact, as Jam maintains, previously unavailable to those employees, the offer of the premium-pay jobs could certainly be seen as an unearned benefit to induce union support. *Savair*, 414 U.S. at 280 ("[A]lthough the benefits granted by the employer were permanent and unconditional, employees were 'not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.'") (quoting *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1973)). And, as discussed above, without an evidentiary hearing on Jam's objections, it is impossible to determine whether the jobs at union venues amounted to an improper inducement to vote in favor of Local No. 2.

It follows that Jam's circumstantial evidence of a concerted effort to incentivize non-union employees with access to Local 2 jobs prior to the vote established a "substantial and material factual issue" sufficient to warrant an evidentiary hearing. The Regional Director thus abused his discretion by failing to investigate or hold such a hearing.

That leaves Jam's contention that the Board's rulings on the challenged ballots were clearly erroneous. Jam takes issue primarily with the Board's decision to uphold the Regional Director's refusal to move the eligibility date in light of the delay attributable to the unfair labor practice charge. Jam

suggests that by failing to count the votes of those employees hired shortly after the original date in the Stipulated Election Agreement, the Board effectively disenfranchised those employees.

Under the Board's election rules, the parties may enter a stipulated election agreement, which must include, among other things, the payroll period to be used for determining voter eligibility. *See* 29 C.F.R. § 102.62(b). The Board has long treated such election agreements as "'contracts,' binding on the parties that executed them." *T & L Leasing*, 318 NLRB 324, 325 (1995) (quoting *Barceloneta Shoe Corp.*, 171 NLRB 1333, 1343 (1968), *enforced mem.*, 1970 WL 5417 (1st Cir. 1970)). As such, election agreements will be enforced except in limited circumstances. For instance, upon a showing of "cause," Regional Directors may revoke their approval of the agreements. And the parties may withdraw from election agreements upon agreement of all the parties or an "affirmative showing of unusual circumstances." *T & L Leasing*, 318 NLRB at 325. Otherwise, the agreement will be enforced so long as the terms are clear and unambiguous and it does not run afoul of settled Board policy or specific statutory exclusions. *Id.*

Given the express and unambiguous payroll period cut-off of October 4, 2015 in the stipulated agreement, we would be hard-pressed to conclude that the Board committed clear error by refusing to allow the ballots of the employees who started working after the cut-off date. Jam cites several cases it claims lend support to its argument that eligibility dates may be moved in the case of a delayed election. But the cases Jam cites not only involve much longer delays (two or more years) than

the seven months at issue here, they also speak to the issue of whether the Regional Director has the *authority* to change the eligibility date when an election is delayed, not to whether it would be an abuse of discretion to enforce the agreed-upon eligibility date. *See Hartz v. Mountain Corp.*, 260 NLRB 323, 327 (1982) (three-member panel of the Board affirmed decision allowing union that had not participated in proceedings for election held two years earlier to withdraw petition for certification and intervention in another union's petition); *Interlake v. Steamship Co.*, 178 NLRB 128, 129 (1969) (concluding that a new eligibility date would be appropriate for a *second runoff election* held *three years* after original election) (emphasis added). No one disputes that the Regional Director *could have* allowed the parties to agree on a new eligibility date or perhaps accepted Jam's request to push back the eligibility date two weeks on account of the delay. Indeed, on review one member of the panel *would have* allowed Jam to push back the eligibility date. That there were reasons for allowing the additional voters who shared a community of interest with the other employees does not mean that it was clear error *not to* count the challenged votes.

As the Board noted, the terms of the stipulated agreement were clear and unambiguous. As detailed above, such terms will ordinarily be enforced. There was nothing so extraordinary about the delay preceding the election here that the Board committed clear error by upholding Local No. 2's challenges to the voters hired after the agreed-upon eligibility date. In light of our deferential standard of review, we affirm the Board's ruling on the challenged ballots.

III.

For the foregoing reasons, we GRANT Jam Productions' petition for review and REMAND for a hearing on its election objection, and DENY the Board's cross-application for enforcement.